# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

KAREN J. KILPATRICK,

    Plaintiff,

v.                                                          Case No. 3:06cv158/LAC

THE UNITED STATES OF AMERICA;
CRAIG W. ROEGNER, Special Agent,
Bureau of Alcohol, Tobacco & Firearms
("ATF"), in his individual capacity;
THE CITY OF PENSACOLA;
AMANDA GRIFFETT, PETER FAULK,
JAMES ANDREWS, BRAD BUDDIN,
and HARRY P. BARRACLOUGH JR., in their
individual capacities; and
UNKNOWN ATF SPECIAL AGENTS and
CITY OF PENSACOLA EMPLOYEES,

    Defendants.
_____/

## ORDER ON SUMMARY JUDGMENT

This cause is before the Court on Motions for Summary Judgment filed by Defendants Craig W. Roegner and the United States of America (Doc. 153); by Defendants Amanda Griffett, Peter Faulk, James Andrews and the City of Pensacola (Doc. 151); and by Plaintiff (Doc. 155), together with documents in support thereof. The parties have filed memoranda and evidentiary materials in opposition. The Court has taken the matter under advisement and is now prepared to rule on the motions.

# I. BACKGROUND

As this is the second round of summary judgment motions, the factual description that follows is largely a replication of the Court's previous description. As the facts of this case are not free from dispute, all reasonable constructions will favor Plaintiff's version of the facts.

On April 19, 2004, Plaintiff was drove her blue van around the City of Pensacola, Florida, with "Remember the Children of Waco" and "Boo ATF" written on some of the van's windows. April 19 marks the date in which the Federal Bureau of Investigation (FBI) and the Federal Bureau of Alcohol, Tobacco and Firearms (ATF) conducted a siege of the Branch Davidian Church in Waco, Texas, which resulted in the deaths of numerous church members, including children and church leader David Koresh.

Plaintiff came to the attention of Defendant Craig W. Roegner, a Special Agent employed in the ATF office in Pensacola, after an FBI agent had noticed the van enter and drive about the parking lot of a building that housed various federal offices, including the ATF and FBI.[1] The ATF also received information that earlier in the day an individual had reported being threatened and assaulted by a person driving a blue van who had some relationship with the Branch Davidian Church.[2] This information was provided by Rickie

---

[1] Plaintiff purposely drove through the parking lot in an effort to be seen from the offices of the ATF. She drove by several police cruisers in the process. Doc. 156-11 at 26.

[2] This information was provided from Rickie Kilpatrick, Plaintiff's brother., who had called the ATF to tell them Plaintiff was mentally unstable and had a permit for a concealed firearm. According to Mr. Kilpatrick, he and Plaintiff had been involved in a domestic dispute. Doc 156-3 at 34-35. There is some question as to whether Roegner knew this information before detaining Plaintiff or shortly thereafter.

Kilpatrick, Plaintiff's brother, who additionally stated that Plaintiff was mentally unstable and had a permit for a concealed firearm. Evidently the assault that Mr. Kilpatrick reported stemmed from a domestic dispute between Plaintiff and him. Doc 156-3 at 34-35. Roegner's supervisor, Agent Rickie Welch, assigned Roegner the task of investigating the van and its driver. Additionally, Roegner had information that an unidentified individual had recently visited the home of an individual in Pensacola who was formerly a firearm dealer and had sold guns to David Koresh at the Branch Dividian Church.

Roegner contacted the Pensacola Police Department and spoke with a dispatcher, Defendant Amanda Griffett, requesting that she send out an alert for law enforcement to find and apprehend the vehicle and then notify him. Roegner indicated that officer safety might be an issue with stopping the van. Doc. 156 at 11-13. Pensacola Police complied with the request, and shortly thereafter Plaintiff was stopped not far from the ATF building by Defendant Pensacola Officer Peter Faulk. As Officer Faulk approached the van on foot, he directed Plaintiff to roll down her window, and she complied. He informed her that someone, meaning Roegner, wanted to talk with her. Plaintiff gave him her driver's license and registration and, noticing that Faulk had his hand on his gun, kept her hands in plain view. Doc. 156-11 at 32.[3]

Minutes later Roegner arrived and approached the van. Roegner returned Plaintiff's driver's licence to her and told her to exit the van. Roegner asked if he could pat her down,

---

[3] Defendant Officer James Andrews was also at the scene, but his involvement in the situation was less than Faulk's, evidently as a "backup."

and Plaintiff consented. Doc. 156-12 at 81-82. Likewise, Roegner asked and received permission from Plaintiff to search her van. *Id.* at 86-87. The search revealed a loaded revolver in Plaintiff's purse and a loaded ammunition magazine in the glove box of the van. The firearm was unloaded and returned to her purse.[4]

Although Plaintiff expressed trepidation at being in the presence of an ATF officer, the two walked over to a nearby tree for shade and conversed at some length about Plaintiff's negative experiences with the ATF and the Waco incident, which resulted in the deaths of people she knew. Agent Roegner told Plaintiff that the statements on her van might upset other ATF agents who also had friends who died during the Waco incident. Roegner at some point advised her to wash the writing off her windows. Doc. 156-11 at 47.[5]

---

[4] Agent Roegner had been made aware that Plaintiff had a weapon permit.

[5] In deposition, Plaintiff provided the following account:

> A: I washed [the writing on the van] off the next day. I was told by Craig Roegner -- he asked me where I was going that day. He said, where else are you going today? I said, as a matter of fact, I have to go to the highway patrol office to get some -- a report of an incident report, and I don't want to be pulled over again. And you need to get on the radio or whatever it is you do, to make sure that that doesn't happen again. And he said to me, well, when you get home, you make sure you wash that off your window.
> Q: Did he say anything else to you at that time?
> A: No, ma'am.
> Q: How did you respond when he told you that?
> A: I was a little upset, because I felt like all he did was pull me over to gripe about what I had written on my window.
> Q: I mean, did you say something back to him when he said, wash that off when you get home?
> A: No. No.

Doc. 156-11 at 47.

A local television journalist arrived during their discussion and began filming. The journalist asked to speak to Plaintiff, who agreed, and Roegner allowed them to speak. Doc. 156-11 at 44-45. According to Plaintiff, once the journalist began interviewing her, Roegner was essentially finished interacting with Plaintiff, although he may have remained at the scene until Plaintiff drove away. Doc. 156-11 at 49-50. Police records indicate that the officers were on the scene for one hour and seven minutes.

## II. MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "[T]he substantive law will identify which facts are material" and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *See id.*

At the summary judgment stage, a court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of fact exists for trial. *See id.* at 249, 106 S. Ct. at 2510–11. A genuine issue exists only if sufficient evidence

is presented favoring the nonmoving party for a jury to return a verdict for that party. *See id.* "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust Co. v. Fidelity and Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

When assessing the sufficiency of the evidence in favor of the nonmoving party, the court must view all the evidence, and all factual inferences reasonably drawn from the evidence, "in the light most favorable to the non-moving party." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993). The court is not obliged, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is "merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249–50, 106 S. Ct. at 2511. "A mere 'scintilla' of evidence supporting the . . . [nonmoving] party's position will not suffice" to demonstrate a material issue of genuine fact that precludes summary judgment. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512).

### III. DISCUSSION

Plaintiff raises constitutional claims under the First Amendment right to free speech and the Fourth Amendment right to be free from unreasonable search and seizure. She also raises tort claims of false imprisonment, intentional infliction of emotional distress and invasion of privacy.

*1. Qualified Immunity*

As an initial matter, Defendants assert qualified immunity. To defeat qualified immunity, it must be shown that 1) the plaintiff's constitutional rights were violated and 2) that those rights were clearly established at the time of the alleged violation. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). It is well settled that "[q]ualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Therefore, this court must first determine whether the facts, read in the light most favorable to Plaintiff, establish that Defendant Roegner's actions amounted to a deprivation of her constitutional rights.[6]

If the answer is yes, the court must then decide whether those rights were clearly established at the time of the events alleged by Plaintiff. *See McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999). In analyzing whether a right was clearly established, the Court

---

[6] As in the analogous action against a state officer under 42 U.S.C. § 1983, in an action against a federal official under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the initial inquiry must focus on whether two essential elements are present:
>  1. whether the conduct complained of was committed by a person acting under color of federal law; and
>  2. whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.

*See Hartman v. Moore*, 547 U.S. 250, 255 n.2, 126 S.Ct. 1695, 1700 n.2 (2006); *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 1696-97, 143 L.Ed.2d 818 (1999); *Parratt v. Taylor*, 451 U.S. 527, 535 (1981).

should consider whether pre-existing law at the time of the alleged acts provided fair warning to Defendant that his actions were unconstitutional. *See Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002). If it would be clear to any reasonable officer in the same situation that his actions were unconstitutional, then qualified immunity is not available, but if "officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

## *2. Fourth Amendment Claim*

Plaintiff claims that Defendant Roegner as well as Defendants Griffett, Faulk, and Andrews, violated her rights under the Fourth Amendment because of their investigatory stop. The Fourth Amendment prohibits unreasonable searches and seizures, and its proper invocation depends on the nature of the search or seizure as well as the factual circumstances surrounding it. *See United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000). Defendants contend that stopping Plaintiff under the circumstances was entirely reasonable under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 120 S. Ct. 673, 675, 145 L. Ed. 2d 570 (2000) (citing *Terry*).

Although there are no rigid limitations as to the permissible duration or scope of a *Terry* stop, because of the noncustodial nature of the investigation, it is designed to be as brief and nonintrusive as possible. *See United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575 (1985); *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988). The detention must last no longer than is necessary to effectuate the purpose of the stop; otherwise, the situation ripens into a full-scale arrest in which probable cause is required. *Sharpe*, 470 U.S. at 685, 105 S.Ct. at 1575; *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325-26 (1983). "Several issues and circumstances are deemed relevant to the analysis, including the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention." *Hardy*, 855 F.2d at 759 (citing *Sharpe*, 470 U.S. at 685-86, 105 S.Ct. at 1575). The objective is to verify or dispel the officer's suspicion in as short a time as necessary. *See Sharpe*, 470 U.S. at 686, 105 S.Ct. at 1575; *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325-26. "A *Terry* stop is justified to give the police an opportunity to engage in brief and nonintrusive investigation techniques, such as noncustodial questioning of the detained person." *Hardy*, 855 F.2d at 759. Ordinarily, law enforcement officials may not conduct a thorough search of the individual or his or her property during a *Terry* stop. *See Royer*, 460 U.S. at 500; 103 S.Ct. 1319, 1325. However, when consent to the search is freely and voluntarily given, the search is within constitutional bounds. See *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004).

In the context of qualified immunity, "the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000) (citations omitted). Thus, "[a] A law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity. *Id.* at 1165-66.

The facts as outlined above differ in one critical respect from the facts that were presented before the Court during its previous summary judgment analysis: it is that Plaintiff now acknowledges that she consented to the search conducted by Defendant. Whereas the Court's previous ruling centered on the long duration of the traffic stop, which was prolonged in significant part by Defendant's search of Plaintiff and her vehicle, the fact that Plaintiff consented to the search fundamentally alters the analysis.

First, given the circumstances of this case, the Court finds that Defendants' suspicions of Plaintiff's activity were reasonable and therefore that they were justified under *Terry* for the traffic stop. The record fairly shows that Plaintiff freely consented to the search,[7] and in light of this fact the Court finds the rest of the stop within constitutional bounds as well. While the duration of the stop must be considered, the fact that a good portion of the time was taken up with a valid search certainly lessens the impact of this factor. Additionally,

---

[7] While Plaintiff indicates that she did not feel free to refuse the search because she felt she would have been arrested as a consequence, this is a conclusory statement based not upon anything that was said or done to her but only upon her subjective impressions given after the fact. Likewise, Plaintiff generally states that the officers were intimidating during the stop because of the way they approached and gathered around her or her vehicle, but her description calls to mind little more than how officers would normally conduct themselves during a proper Terry stop. The Court therefore finds on the facts before it that consent was freely provided.

nothing in the record indicates any overt show of force or restraint, and much of the time was spent with Plaintiff in conversation with Officer Roegner and the media. Although Plaintiff states she was generally fearful during the incident, this appears to owe more to the emotionalism of the Waco anniversary than to the actual traffic stop. The actual situation and the interaction of parties reveal little in the way of heightened tension or animosity, and Plaintiff appeared to be conversant and relatively agreeable throughout.[8]

Therefore, the Court finds no Fourth Amendment violation committed by any of the Defendants.

### 3. *First Amendment Claim*

Plaintiff next claims that Defendant Roegner's actions in effecting the traffic stop amounted to retaliation against her for exercising her right to free speech. To sustain a claim of retaliation for the exercise of First Amendment rights a plaintiff must establish that: (1) the speech or act was constitutionally protected; (2) the defendant's retaliatory conduct adversely affected the protected speech; and (3) a causal connection existed between the retaliatory conduct and the adverse effect on speech. *See Bethel v. Town of Loxley*, 221 Fed. Appx. 812, 813 (11th Cir. 2006) (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)). While an individual need not have been actually deprived of his or her First Amendment rights in order to establish an actionable claim, the alleged deprivation must be

---

[8] In fact, Plaintiff stated she was unaware that the entire incident had taken so long until she arrived at her house and noticed the time. Doc. 156-11 at 42.

more than a "*de minimis* inconvenience" to the exercise of those rights. *Id.* To establish an adverse effect, the offensive conduct must be such that it "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* (quoting *Bennett*, 423 F.3d at 1250). "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Bennett*, 423 F.3d at 1254 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). Thus, a successful claim "depends not on the denial of a constitutional right, but on the harassment [one] receive[s] for exercising [her] rights." *Bennett*, 423 F.3d at 1253.

As with her Fourth Amendment claim, Plaintiff's First Amendment claim is greatly affected by the fact now brought to light that she consented to the search. Much of the basis of the Court's earlier opinion was that Plaintiff was harassed by the search of her person and her vehicle without her consent. The duration of the stop, which might formerly have been seen as essentially prolonging the harassment, is now viewed more neutrally as a sort of waiting period that occurred while the police carried out the search allowed by Plaintiff.

The Court recognizes that an officer could conduct a *Terry* stop that was in all respects valid and yet use the stop as an opportunity to engage in retaliation for the exercise of free speech. *See, e.g., Adams v. James*, 784 F.2d 1077, 1080 (11th Cir. 1986) (finding that claim of retaliation can exist even though actions taken in retaliation were otherwise proper). That said, the Court finds little to suggest that the Defendant Roegner took any opportunity

to retaliate against Plaintiff or to carry out his duties in anything but a calm and professional manner. In fact, Roegner seemed to be mindful of the balance that needed to be struck between his law enforcement duties and the respect owed to Plaintiff's First Amendment rights as she further exercised them with the media. The fact that Plaintiff was able to spend time engaged in conversation relevant to the very issues at hand, while not direct, objective evidence that there was no adverse effect on protected speech, does tend to show that Roegner was not exactly intrusive or antagonizing.

Given the validity of the stop and search and the relative peace with which it was conducted, it would seem the only questionable conduct was Roegner's comment that Plaintiff should wash the words off her van when she arrived home. Especially when taken in context of the situation, and given the tenor of the discussion that evidently evolved between Roegner and Plaintiff, this comment alone is *de minimis* and therefore an insufficient basis from which to conclude that Defendants' actions would deter an ordinary person from the exercise of her First Amendment rights. The Court therefore finds no violation.

Nonetheless, because Plaintiff's First Amendment claim presents a somewhat closer call than does her Fourth Amendment claim, the Court elects to additionally address the qualified immunity issue. That said, the Court finds little to suggest that the Defendant Roegner took the opportunity to retaliate against Plaintiff. Rather, Defendant carried out his duties calmly and within the protocol of a law enforcement stop. Moreover, his actions

seemed mindful of the balance that needed to be struck between his law enforcement duties and the respect owed to Plaintiff's First Amendment rights. Thus, while Roegner carried out his duties he allowed Plaintiff the opportunity to engage in further First Amendment activity.

The parties cite surprisingly little pre-existing case law to closely compare with the particular facts that are before the Court, where the carrying out of a *Terry* stop might be seen to impinge upon one's First Amendment rights. Plaintiff cites *Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807 (6th Cir. 2007), as a factually similar case finding constitutional violations where an initially valid police stop of abortion protesters was found to have evolved into an arrest for which no probable cause existed. Unlike the present case, however, in *Bio-Ethical Reform* the length of detention, approximately three hours, was found to have far exceeded the purpose of the stop, and the plaintiffs in that case were subjected to multiple searches even after the initial searches uncovered nothing. *Id.* at 823-27. An informative contrast to the facts in *Bio-Ethical Reform* is a Supreme Court case cited in that opinion, *United States v. Montoya de Hernandez*, 473 U.S. 531, 542-544, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), which found a sixteen hour detention to be reasonable because the officers acted diligently upon their suspicion that the suspect was carrying drugs in her alimentary canal. Thus, *Montoya de Hernandez* certainly stands for the proposition that duration of time is not alone a determinative factor but should be considered in light of the surrounding circumstances. The Court finds this case to align more closely with *Montoya de Hernandez* in that the search of Plaintiff's property was not alleged to have taken longer

than necessary, nor did Officer Roegner take any significant actions extraneous to his duties.[9]

The Court concludes that Defendant Roegner's actions were reasonably calculated in light of the law existing at the time to properly conduct the *Terry* stop in a manner that would not unconstitutionally infringe upon Plaintiff's First Amendment rights. Any deterrence on Plaintiff's rights to free speech were owing the bare fact of the stop itself and not to any extraneous actions taken by the Defendant. Therefore, the Court finds that Defendant is entitled to qualified immunity on this claim.

### *4. False Imprisonment Claims*

Plaintiff next claims false imprisonment based on Officer Roegner's investigative stop and alleged detainment of her. A constitutional claim of false imprisonment is based upon the continued detention beyond the time that it should have been known that the detainee was entitled to release. *See Cannon v. Macon County*, 1 F.3d 1558, 1562-1563 (11th Cir. 1993). For a claim to be actionable, the plaintiff must show an intent to confine, acts resulting in confinement and awareness by the victim of the confinement or resulting harm. *See Ortega v. Christian*, 85 F.3d 1521, 1526 n.2 (11th Cir. 1996). Similarly, under the common law in Florida, false imprisonment results from the restraint or detention of a person against her will without legal authority and in a manner which is unreasonable and unwarranted under the

---

[9] In fact Defendant states, and the facts tend to show, that Roegner and the other officers were finished with their business before the hour and spent the rest of the time waiting while Plaintiff finished speaking with the media.

circumstances. *See Montejo v. Martin Memorial Center, Inc.*, 935 So.2d 1266, 1268 (Fla. 4th DCA 2006); *Maybin v. Thompson*, 606 So. 2d 1240, 1241-1242 (Fla. 2nd DCA 1992).

Having disposed of the previous claims, the Court readily concludes that Plaintiff's claims of false imprisonment must fail. Assuming that the stop conducted by the officers may be construed as a "confinement" as contemplated in a claim of false imprisonment, that confinement was reasonable and warranted under the circumstances.

### *4. Claims of Invasion of Privacy and Intentional Infliction of Emotional Distress*

Last, Plaintiff claims that Defendants' actions amounted to an invasion of privacy and the intentional infliction of emotional distress. The "intrusion" is not touching of the person. An invasion of privacy occurs only where there is an unwarranted intrusion or exposure of the plaintiff or her property when there is a reasonable expectation of privacy. *See Allstate Insurance Co. v. Ginsberg*, 863 So. 2d 156 (Fla. 2003). An intentional infliction of emotional distress is reserved only for conduct that can be said to be outrageous and beyond all bound of decency, and which intentionally causes the victim severe emotional distress. *See Dominguez v. Equitable Life*, 438 So. 2d 58 (3d DCA 1983). Since it has been determined that the Defendants carried out the investigative stop in a constitutional manner, the Court likewise finds Plaintiff's privacy rights were not violated, nor was she treated severely or outrageously or in a manner calculated to inflict severe distress. Accordingly, these claims must fail as well.

## IV. Summary

The Court's ruling in this matter may be summarized as follows, and IT IS HEREBY ORDERED:

1. The Motions for Summary Judgment filed by Defendants Craig W. Roegner and the United States of America (Doc. 153) and by Defendants Amanda Griffett, Peter Faulk, James Andrews and the City of Pensacola (Doc. 151) are **GRANTED**.

2. The Motion for Summary Judgment filed by Plaintiff (Doc. 155) is **DENIED**.

3. Consistent with this order, the Clerk of Court is directed to enter summary judgment in favor of Defendants Craig W. Roegner, the United States of America, Amanda Griffett, Peter Faulk, James Andrews and the City of Pensacola. Plaintiff shall take nothing further by this action and goes without day.

4. As all claims are resolved as against all parties in this case, the Clerk of Court is directed to enter final judgment and close this case.

**ORDERED** on this 29th day of December, 2009.

                                        s/*L.A. Collier*
                                          Lacey A. Collier
                                Senior United States District Judge